**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01188-CMA-KMT

ANTONIO DELAROSA, and
ROSANNA MENDOZA-RIOS,

    Plaintiffs,

and

The Phoenix Insurance Company,

    Plaintiff-Intervenor,

v.

COYOTE PUMPING SERVICES, INC., and
THE MINE SUPPLY COMPANY,

    Defendants.

---

**ORDER DENYING DEFENDANT COYOTE PUMPING SERVICE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant Coyote Pumping Service's Motion for Partial Summary Judgment. (Doc. # 63.) For the following reasons, the Court denies the motion.

## I. BACKGROUND

This is a construction-worksite injury case. The alleged injuries occurred in the Abo Canyon, near Albuquerque, New Mexico, where a general contractor, Ames Construction, was building parts of a railway bridge, including several sixty-foot-tall

concrete support columns. One of the plaintiffs, Antonio Delarosa, is an employee of Ames.

Ames subcontracted the work of transporting and pumping the concrete for the bridge support columns to Defendant Coyote Pumping Services ("Coyote"). For this project, Coyote had obtained a specialized hose that connected to a pipe, which could attach to a pump truck (also called a pumper) and then pour concrete. Coyote's idea appears to have been that the truck would pump concrete into the pipe and the concrete would then flow through the hose and ultimately into the formwork for the bridge columns. Coyote charged Ames an hourly rate for use of Coyote's concrete pump trucks. Further, there is no evidence that Coyote sold any equipment to Ames—or to anyone else. (Doc. # 63 at 2-3 (citing deposition testimony from employees of Ames and Coyote)).

A central dispute between the parties concerns what they refer to as the "hose-coupling assembly," a device used in the concrete pour project. The hose-coupling assembly encompasses part of the pipe from the pump truck, the hose through which the concrete was poured, and the hardware (in this case metal rings, among other things) used to connect the hose to the pipe. (Doc. # 1 at 4.) It is undisputed that Coyote supplied the pipe for this device, while the hose and hardware were supplied by a second defendant, The Mine Supply Company (IMSCO).

On Plaintiffs' view of the facts, which this Court must accept for purposes of summary judgment, the hose-coupling assembly was designed and manufactured

by IMSCO and Coyote, with the assembly of the device completed by IMSCO. In support of this position, Plaintiffs principally rely on the deposition testimony of Richard L. Sedillo, an IMSCO employee who played a primary role in the construction of the device. (Doc. # 67-3.)

In relevant part, Mr. Sedillo testified that in creating the hose-coupling assembly, Coyote had the option of buying either a concrete hose, normally used to pour concrete, or a discharge hose, which is normally used to pour water. As alleged by Mr. Sedillo, Coyote opted for the discharge hose because it was the cheaper option. Coyote insisted on this choice, even though Mr. Sedillo voiced concern that it would be better to use a concrete hose to pour concrete. (*Id.* at 4-6.) Indeed, when Mr. Sedillo was asked in his deposition whether it was true that a Coyote employee decided "after hearing your concerns [about not using a concrete hose], [that Mr. Sedillo should] go ahead and proceed with assembling this piece of equipment using the discharge hose," Mr. Sedillo responded, "[y]es, and [the Coyote employee] said that he would take full responsibility because he'd done this before." (*Id.* at 6.)

Ultimately, Mr. Sedillo assembled the device by connecting the discharge hose and the pipe. He also added some rings inside the hose and then a band over the hose to secure the two devices to one another. (*Id.* at 4.)

After Mr. Sedillo completed his work, Coyote attached the hose-coupling assembly to a concrete pump truck. On February 8, 2010, as alleged in the complaint, "the hose-coupling assembly on the pumper failed, knocking [Mr.] Delarosa off [a]

platform into a caisson.  Mr. Delarosa violently collided with the caisson and materials used to reinforce the concrete."  (Doc. # 1 at 5.)

Mr. Delarosa alleges a number of physical injuries resulting from this incident.  Further, his alleged common-law wife, Plaintiff Rosanna Mendoza-Rios ("Ms. Mendoza"), argues that she "has also suffered damages arising from her spousal relationship with [Mr.] Delarosa.  Among the damages suffered by [Ms. Mendoza] are the loss of society, consortium, companionship, and support of [Mr.] Delarosa."  (*Id.* at 8.)

The precise nature of Ms. Mendoza's relationship with Mr. Delarosa is a matter of dispute between the parties.  In response to questions raised in interrogatories, Ms. Mendoza stated that she had been in two common-law marriages: the first one was to Rodrigo Valdez, from 1998 until 2000, and the second was to Mr. Delarosa, from 2001 to the present.  (Doc. # 63-6 at 1.)  At her deposition, Ms. Mendoza gave testimony consistent with what she had said in the interrogatory responses. In particular, she stated that she had been married to Mr. Valdez, that she had one child with him, that her relationship with him lasted for a year, and that it ended because of domestic violence.  She then later began a relationship and ultimately a common-law marriage with Mr. Delarosa.  (Doc. # 63-7 at 2.)

In an affidavit submitted in response to her summary judgment motion, Ms. Mendoza changed her position on her relationship with Mr. Valdez.  In the affidavit, she stated, among other things, that she had lived "intermittently" with Mr. Valdez from

4

1998 until 2000, that Mr. Valdez described her as his girlfriend and not his wife, and that her testimony to the contrary "resulted from my misconception of what constitutes a common law marriage under Colorado law." (Doc. # 67-8 at 1-2.)  Finally, in the same affidavit, Ms. Mendoza stated that she has two children with Mr. Delarosa; that she files joint tax returns with Mr. Delarosa; that Mr. Delarosa claimed her as his wife on employment documents with Ames; and that her family, friends, and neighbors consider her and Mr. Delarosa to be a married couple.  (*Id.* at 1.)

Coyote filed the instant motion for summary judgment, advancing two arguments. First, Coyote asserts that it is entitled to summary judgment on Mr. Delarosa's claim for strict products liability because Coyote is not a manufacturer of a defective product for purposes of a strict products liability claim.  Second, Coyote argues that it is entitled to summary judgment on Ms. Mendoza's loss of consortium claim because Ms. Mendoza never dissolved her previous marriage to Mr. Valdez.  Thus, Coyote concludes that Ms. Mendoza is precluded from raising a loss of consortium claim linked to Mr. Delarosa, as her second common-law marriage cannot be valid.

## II. **DISCUSSION**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  To overcome a motion for summary judgment, the non-moving party must present enough evidence to allow a reasonable jury to find in its favor.  *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).  In analyzing the

evidence on a motion for summary judgment, this Court must view the factual record and draw reasonable inferences in favor of the non-moving party. *Kidd v. Taos Ski Valley, Inc.,* 88 F.3d 848, 851 (10th Cir. 1996).

Further, this Court notes that after the parties had submitted all relevant briefing on Coyote's partial summary judgment motion, this Court issued an order concerning the law to be applied to each of the claims at issue here. As was detailed in that order, this Court will apply New Mexico law for Plaintiffs' strict products liability claim and Colorado law for the loss of consortium claim. (*See* Doc. # 78.)

Applying the law of these two states to these two different claims, the Court provides its reasoning below for denying Coyote's motion as to both claims.

### A. STRICT LIABILITY CLAIM

The first claim relevant to this motion implicates the sales/service distinction in the law of strict products liability and how that distinction applies to the aforementioned hose-coupling assembly. On the one hand, Plaintiffs seek to characterize Coyote as a manufacturer of the hose-coupling assembly and, therefore, liable for any injuries resulting from its use. If the Court accepts this characterization, Coyote could be liable for injuries caused by the accident, regardless of whether or not Coyote was negligent in how it conducted the Abo Canyon project. On the other hand, Coyote seeks to characterize itself as a provider of **services** rather than **products**. If the Court accepts this characterization, the strict liability claim fails and Plaintiffs must establish negligence to obtain a judgment in their favor.

The distinction between manufacturers and service providers for purposes of a strict liability claim is well established in New Mexico law.  New Mexico Courts have, for example, acknowledged that a strict liability theory applies to the **manufacturer** of a defective medical implant, but not to the hospital that provided the service to implant it, *Parker v. St. Vincent Hosp.*, 919 P.2d 1104, 1107 (N.M. App. Ct. 1996) (Hartz, J.), or that strict liability could apply to the **manufacturer** of defective equipment used in an oil field, but not to the operator of that field who merely used the equipment, *Arenivas v. Cont'l Oil Co.*, 692 P.2d 31, 34 (N.M. Ct. App. 1983) (so holding in the context of a directed verdict).

Indeed, as a New Mexico federal district court rightly observed the "thread that binds" most New Mexico cases, including *Parker* and *Arenivas*, where defendants have been found not liable under a strict products liability theory, is that "the alleged supplier did not sell the defective product to anyone," but rather became affiliated with the product by merely using it.  *Provencio v. Ford Motor Co.*, CIV. 05-623 JB/ACT, 2005 WL 3662957, at *8 (D.N.M. Sept. 29, 2005) (citing *Parker* and *Arenivas*); *see also Ruiz v. S. Pac. Transp. Co.*, 638 P.2d 406, 412 (N.M. Ct. App. 1981) ("Providing negligent services may trigger ordinary negligence or breach of contract actions, or malpractice suits, but it does not form the basis for actions in strict liability." (internal citations omitted)); *Lopez v. Am. Baler Co.*, No. CIV-11-0227 JB/GBW, 2013 WL 4782155, at *13 (D.N.M. Aug. 12, 2013) (interpreting "New Mexico strict-products liability law

to foreclose recovery against parties that do not place an allegedly defective product on the market").

Reviewing *Parker* and *Arenivas*, it is tempting to impose a dichotomy in this case similar to the ones that rightly applied in those cases. For example, Coyote can be viewed as the service provider and subject to potential liability on a negligence theory, while IMSCO, seemingly the more traditional manufacturer, is potentially liable in strict products liability for producing the defective device. As further support for such a theory, Coyote emphasizes that it provided concrete pumping services at an hourly rate as a subcontractor to Ames and that it was never in the business of placing any products—defective or otherwise—on the market.

The problem with endorsing this position, however, is that Coyote, unlike the defendants in *Parker* and *Arenivas*, has a number of direct links to the design and manufacture of the allegedly defective product at issue here. First, Coyote supplied part of the design for the hose-coupling assembly—it opted for a design with a discharge hose, rather than a concrete hose. Second, unlike the defendants *Parker* and *Arenivas*, Coyote asked IMSCO, the other alleged manufacturer of the hose-coupling assembly, to disregard concerns about the suggested design for its product—indeed, it even went a step further and conceded that it "would take full responsibility" for any problems with the design. (Doc. # 67-3 at 4.) Finally, Coyote supplied material—in particular, the pipe to be used in the hose-coupling assembly—that was integrated into the finalized product.

8

These crucial facts transform Coyote from its principal role as a service provider into a contributor to the manufacture of an allegedly defective product.  Indeed, if Coyote had been an engineering company charged **exclusively** with the design of hose-coupling assemblies or if it had been a pipe-supplier focused **exclusively** on providing piping for pump trucks, there would be little basis to question that it was a designer or manufacturer for purposes of a strict products liability claim.  That Coyote serves two distinct roles on the hose-coupling assembly supply chain (as part designer/manufacturer and ultimate recipient of the allegedly defective product) should not change this calculus.  *Cf. Brooks v. Beech Aircraft Corp.*, 902 P.2d 54, 59 (N.M. 1995) (noting that one policy rationale behind New Mexico's strict products liability regime is "providing full chain of supply protection" which means that "suppliers who otherwise might not be liable because of a passive role in the chain of supply should be encouraged to select reputable and responsible [partners] who generally design and construct safe products and who generally accept financial responsibility for injuries caused by their defective products").

To be sure, Coyote appears to dispute the veracity of Mr. Sedillo's deposition testimony, upon which Plaintiffs heavily rely.  (*See, e.g.*, Doc. # 70, at 2-3 (denying a number of facts described as undisputed by Plaintiffs).)  Further, this Court is not blind to the incentive that Mr. Sedillo, as an employee of IMSCO, could have to painting Coyote as a collaborator in the design of a defective product.  But these are factual and credibility issues that must be resolved by a jury, not by this Court.

## B. LOSS OF CONSORTIUM CLAIM

The second dispute between the parties concerns Ms. Mendoza's claim for loss of consortium. As to this claim, Colorado law accords a married woman the right to recover for the loss of consortium of her husband. *See* Colo. Rev. Stat. § 14-2-209. Further, Colorado law also recognizes a right to common-law marriage, which requires, among other things, "the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship." *People v. Lucero*, 747 P.2d 660, 663 (Colo. 1987). Finally, Colorado law precludes someone from being married to two people at the same time. *See* Colo. Rev. Stat. § 14-2-110(1)(a). Such a marriage, including a common law marriage, is invalid. *See, e.g.*, *People v. Maes*, 609 P.2d 1105, 1108 (Colo. App. 1979).

In this case, Coyote argues that this Court should find, as a matter of law, that Ms. Mendoza was in a common law marriage with Mr. Valdez and that this prior marriage, which was apparently not dissolved, precludes her loss of consortium claim. As its primary support for this position, Coyote relies on Ms. Mendoza's aforementioned concessions about her prior common-law marriage in interrogatory responses and deposition testimony. Coyote further asserts that this Court should disregard the affidavit submitted in response to the summary judgment motion as a sham affidavit that was manufactured merely to create a genuine issue of material fact. *See, e.g.*, *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) ("[C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.").

This Court cannot agree with Coyote's position on these questions. First, "[a] determination of whether a common law marriage exists turns on issues of fact and credibility," *Lucero*, 747 P.2d at 665, and those are questions more properly submitted to the jury as fact-finder, especially when one party disputes the validity of a prior marriage that serves as the basis for invalidating a later marriage. *Cf. Deter v. Deter*, 484 P.2d 805, 807 (Colo. App. 1971) (declining to find, as a matter of law, that no common law marriage existed because it was unclear whether a woman had divorced her prior husband, even though she could produce no documentation of the divorce or a record of her prior husband's death).

Second, as Coyote also acknowledges, it is well established that affidavits such as Ms. Mendoza's are generally disregarded as shams only if they contradict prior testimony in a conclusory manner. At the same time, if a party provides sufficient basis for explaining the contradiction, the affidavit cannot automatically be excluded from consideration, even if the contradiction impugns the credibility of the affiant.[1]

---

[1] *See, e.g.*, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . *without explaining the contradiction or attempting to resolve the disparity*" (emphasis added)); *Franks*, 796 F.2d at 1237 (10th Cir. 1986) ("Factors relevant to the existence of a sham fact issue include . . . *whether the earlier testimony reflects confusion which the affidavit attempts to explain.*" (emphasis added)); *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1281-82 (10th Cir. 2003) ("[A]n inconsistent affidavit may preclude summary judgment . . . if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony[.]") (quoting *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104 (7th Cir. 1985)); *see also* 10B Charles Alan Wright, et al., Fed. Prac. & Proc. Civ. § 2738 (3d ed. Apr. 2013) ("[A] witness' affidavit will not be *automatically excluded* because it conflicts with the witness' earlier or later deposition, despite the greater reliability usually attributed to the deposition. The court may, however, consider whether the conflict creates a credibility issue preventing summary judgment from being entered." (footnotes omitted; emphasis added)).

In this case, this Court finds that Ms. Mendoza's affidavit is not a sham because she provides sufficient explanation for why she was confused in prior testimony about her relationship with Mr. Valdez. In particular, as Ms. Mendoza explains, her prior testimony was a lay and uninformed opinion about the nature of this relationship. The original testimony and her revisions to it were the result of a plausible confusion about the law. *Cf. Kahn v. INS*, 36 F.3d 1412, 1419 (9th Cir. 1994) (Kozinski, J., dissenting) (discounting the sole record evidence of a common law marriage, which comprised an offhand statement made by the alleged spouse in a common law marriage, in part because the declaration was "not a statement of fact; it [was] a legal conclusion, something [the spouse was] not competent to give"). While the inconsistencies that Coyote emphasizes might create credibility problems for Ms. Mendoza at trial, they preclude this Court from finding, as a matter of law, that she was previously married to Mr. Valdez and that her new marriage to Mr. Delarosa is invalid.

### III. CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant Coyote Pumping Service's Motion for Partial Summary Judgment (Doc. # 63.) is DENIED.

DATED: February __24__, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge